### In re WILSON–NOBLES–BARR CO.

(District Court, W. D. Washington, N. D. October, 1918.)

1. BANKRUPTCY ⚖228—FINDINGS OF REFEREE—CONCLUSIVENESS.

The findings of a bankruptcy referee, who heard the evidence, observed the conduct of witnesses, etc., will not be disturbed, where the record presents nothing to challenge his conclusions.

2. CONTRACTS ⚖94(1)—FRAUD.

A contract cannot be rescinded because of fraud, except for a misrepresentation regarding a past or existing fact, which was relied upon.

3. CONTRACTS ⚖99(3)—FRAUD—EVIDENCE.

A party charging fraud has the burden of proving it by clear and convincing evidence.

4. BANKRUPTCY ⚖212—RECLAMATION PROCEEDING—EVIDENCE.

In proceeding to reclaim goods sold a bankrupt, evidence *held* to show the sales were induced by satisfactory business relations existing between the parties, and not, as the referee found, by false statements made by the bankrupt to mercantile rating agencies six months and a year before the sales.

5. CONTRACTS ⚖143—CONSTRUCTION—POWER OF COURTS.

Courts cannot make contracts; they can only construe and adjudicate with relation to them.

In Bankruptcy. In the matter of the Wilson-Nobles-Barr Company, a corporation, bankrupt. On petition to reclaim property alleged to have been sold to bankrupts through fraudulent representations. From an order of the referee requiring return of the goods or payment therefor, the trustees petition for review. Referee's order reversed, and order denying petition to reclaim.

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Will J. Griswold, of Bellingham, Wash., for trustee.

Walter B. Whitcomb, of Bellingham, Wash., and Grinstead & Laube, of Seattle, Wash., for claimants.

NETERER, District Judge. The issue before the court is the right of the Wenatchee Flouring Mills, Armour & Co., and Swift & Co., to reclaim goods sold to the bankrupts, respectively through fraudulent representations it is charged. The matter was tried before the referee, who entered an order for the return of the goods to the respective claimants or payment of the value thereof. The trustees have petitioned a review.

The false statements charged were made, one to Bradstreet, February 1, 1916, and one to R. G. Dun & Co., September 17, 1916. The goods were sold by the Wenatchee Flouring Mills, March, 1917, and delivered the 16th day of April, 1917. This sale was made upon the statement of February 1, 1916. The Armour & Co. and Swift & Co. sales were made about the same time, relying upon the Dun statement of September 17, 1916. It is also contended by the trustees that the creditors named waived any preference and assumed the status of general creditors by filing their claims and participating in the election of trustees; while the creditors admit participating at the election of the trustees, state that in filing their claim they reserved the right to proceed against the specific property, if it developed that the property was obtained by fraud, and that the trustee for whom they voted was not elected, hence their activity in the election was without effect, and they are not estopped from prosecuting this proceeding, since the fraud was not discovered until after the election; and that, the referee having found in their favor upon the facts upon the general issue, the court would be bound thereby.

[1-5] This court said, in the Matter of Lester W. Davis, Bankrupt, filed December 24, 1915:

"The referee heard the evidence, observed the conduct and demeanor of the witnesses, and was therefore in a position to weigh the evidence, and where the record presents nothing to challenge the conclusion, the findings will not be disturbed."

I think this is the rule. An examination of the evidence in this case shows that the bankrupts have been engaged in business for many years; that the petitioning creditors had been trading with this concern for a number of years, and, with relation to the Wenatchee Flouring Mills claim, the sale was made by a traveling salesman, who called and took the order in the usual way. No statement was made with relation to the financial status, and in response to the question:

"What conversation did you have with Mr. Wilson if anything, pertaining to credits and payments?"

—he said:

"I don't remember whether that conversation came up there at that time, but I think it was about that time they had sold some mill property, and he simply said they would be in pretty good shape from now on and in condition to pick up their discounts on flour."

The witness also said:

"Yes sir. However, I would have taken the order, whether this conversation had come up or not, for in the years we have sold them we have absolutely never questioned them."

Afterwards, in conversation with Wilson with relation to a car that had not been paid for, said:

"He said: 'I will see to it immediately that the remittance is made on that car.'"

The manager of the Milling Company stated that credit was extended on "our past experience with the account and the Bradstreet's Commercial report," and further said to questions propounded:

"Q. They had always paid their bills? A. Yes, sir.
"Q. And you had no reason to believe this would be any different from any other car they had ordered? A. No, sir.
"Q. And when the order came in from Mr. Conner you just put it down in the ordinary course of business to be shipped according to his direction? A. Yes, sir.
"Q. You don't know whether this report came from Bradstreet or whether it came from Wilson, Nobles & Barr, do you? * * * A. No; I don't know."

On recross-examination the witness stated:

"* * * We always took into consideration the statements we had received, and our past experience, in figuring whether or not we were going to fill that order when it came in."

Mr. Anderson, the agent for Armour & Co., said in substance:

"Nobles did not say they were not making any money. I implied from what they said they were in better condition than they had been. He made no statement about paying any bills."

And the statement of the credit man is in substance the same as of the Wenatchee Flouring Mills, as is also the testimony of Swift & Co.

There is a further uncertainty with relation to the goods of Armour & Co., sought to be reclaimed, as to being the goods that were actually sold upon the date alleged. The witness says he inferred that the goods were purchased within a given time, and further said credit was based "to some extent" on promptness of payment of monthly accounts and also "moral risk." Some conversations were had with some member of the firm as to the financial status after the goods were sold, but these can have no bearing. The face of the record challenges the conclusions.

This court has frequently held, and I think it is the universal rule, that a representation as a basis for the rescission of a contract on the ground of fraud must be a statement which represents a past or existing condition or fact and must be relied upon. Fraud is never presumed, and the burden is upon the party charging it, and the proof must be clear and convincing. I have no hesitancy in saying that the statements referred to, one more than a year old and the other six months, under the circumstances shown, were not the basis of credit, but that the sales were induced because of the former and existing business relations between these parties. Courts cannot make

contracts; they can only construe and adjudicate with relation to them.

With this disposition, it is unnecessary to express any view as to the effect of participation in the election of trustees.

The order of the referee is reversed, and an order denying the petitioners to reclaim may be presented.